Good morning, ladies and gentlemen. Our first case for today is Andy Mohr Truck Center v. Volvo Trucks North America. Mr. Warren. Your Honors, may I please score? Tom Warren, on behalf of Volvo Trucks. Your Honors, the District Court should have granted judgment as a matter of law in this case because the plaintiff failed to make a prima facie case of discrimination. There are five fundamental reasons why the plaintiff failed to make that prima facie case. The first one is that the comparisons that were at issue in this case were, as a matter of law, not substantially similar. The second one is that- Isn't that a factually based point? I mean, the jury knew what was similar about them and what wasn't similar about them. The truck model apparently was similar. Maybe there were some other situations that weren't. But why wasn't that for the jury? Well, as this Court knows from Canada Dry and from Wright Mohr v. Rigo, these are questions that this Court has not hesitated to analyze the facts and grant either a judgment as a matter of law or to- No, it's not always a question of law, not always a question of fact. Why do you think it's a question of law here? Well, first of all, it's the nature of the industry. So on the one hand, you have, as was discussed by the Court in Canada Dry, and that was reflected in the discussion by the district court below, here you have a custom industry where the quotes are derived based upon competing quotes from other dealers. So you have a customer who comes into a dealership, has perhaps already gotten a quote from another manufacturer, and every single one of these quotes is custom ordered and tailored. Right. Your position seems to be that comparisons are impossible here, right? Not impossible. There are some. Well, you've presented to the jury this kind of infinite variables theory, right? And that's not, at least according to some of the evidence that favors the Mohr side, the way you folks actually did business. Well, I think the evidence shows, and even the testimony of the witnesses cited by Mr. Mohr in this case, who admitted on cross-examination that there were a multitude of variables that went into this decision. And mind you, there were a multiple of variables that went into the requests for RSAs, for concessions in these cases. And I think the proof is in the pudding in these cases. If you look at even among the comparisons that Andy Mohr Truck Center put together for this analysis, their own requests for concessions varied, even within their own construct. So one has to ask oneself the question, how could that be? If these are truly similarly situated circumstances, why is the dealer asking for a different RSA concession in different cases? And the reason is because these concession requests are backed in, depending upon the competitive circumstances of the case. Did you, if I recall correctly, the other side had, and I'm confused about who to call plaintiff and who to call defendant in this case, but did the other side, the other side had an expert with a lot of experience in the industry who said this is a reasonable way to look at this comparison. And did you have anything like that? Well, we did. We cross-examined the expert, and we went through and we introduced the evidence of the full set of data, and counsel went through in closing argument and identified each of the rationales that we've identified here as to why you can't, these are not comparable. So between cross-examination, we didn't put on an expert on this issue. We were of the opinion that they hadn't established a prima facie case. Can I ask you whether you conceptualize your theory as fundamentally, or this case being fundamentally about whether price discrimination was going on that disfavored Mr. Moore and that Volvo says there was no such price discrimination or whether it's some other form of discrimination between Mr. Moore and the other dealers? Well, Your Honor, again, the price discrimination claim in this case was an 11th-hour claim. But can I just nail that down? So I'm just trying to figure out what language we're all speaking here, and if your language is different from theirs, that will tell me something at least, not too much but a little bit. But do you conceptualize the claim that you were defending against as fundamentally a price discrimination claim, and was your defense that it was apples and oranges so there couldn't be a showing of price discrimination? Yeah. I would concede for terminology's sake that this was a case about price discrimination under the Indiana statute. So in addition to the argument, and I would submit to the honors, although it is a fact-based inquiry with respect to whether it's similarly situated, as this Court has said, it needs to be similar enough in material respects in order for you to be able to infer anything from it. And I would submit that based upon the testimony of all the witnesses and the actions of Andy Moore itself in this case, that because these were quotes that were derived from the competitive circumstances of individual cases, and because the trucks were completely different with totally different options on them, where in their comparisons they weren't even comparing the same customer, completely different deals, completely different competitive situations. So putting that issue... This sounds a lot like the kinds of arguments we hear in employment discrimination cases about just how similar is similar, and it doesn't have to be perfect. It has to be reasonable. And that's often a jury question. Why don't you move on to some other issues or arguments you had to offer here. Yes, Your Honor. So the second of these arguments is essentially the cherry-picking notion here, which is even if you accept for the sake of argument that these comparables would be similarly situated for comparison's sake, the cherry-picking that was engaged in by the attorneys in this case when they were putting together the 13 charts was not appropriate, was not reflective of the evidence below. So let me ask you a factual question here. We wind up with 13 transactions, and I guess the jury apparently accepts what? That about nine of them are... It doesn't seem to be all 13. But what's the denominator? The expert makes some reference to looking at 20,000. Is that right? How many transactions over what period of time are we supposed to look at this 13? Well, if you look at the underlying data, it shows that in these 13 scenarios using the windows of time around the transactions, you're looking at about 780 to 800 transactions. And I can get you the site in the record where that is. That's fine for now. And of those 800 approximately that are data points that are in the record, as many as 188, mind you, for just one of the comparisons. The plaintiffs in this case chose anywhere between 1 and 9 for comparison purposes, and in total about 58. So you have 58 out of about 800 that they're using for comparison's sake. And we only did as an intellectual exercise, although we showed it to the jury as well, that you can create your own chart based upon this information that would show precisely the opposite of what the plaintiffs... Was that done through a witness? It was done through the introduction of the evidence and demonstrative exhibits in closing argument. That doesn't quite answer my question. Did you do it through a witness? Yes. We introduced the evidence, the raw data evidence through a witness. Did a witness explain it, your counter to the cherry-picking? Well, the witness explained what the data was. The witness did not parse the data piece by piece. And did you cross the Moore expert on that data? Yes. Okay. Yes. And, in fact, if you look at the closing argument, there were perhaps 10 or 15 pages of closing argument by trial counsel in this case going through each one of these exhibits. And rebuttal from Andy Moore saying this is lawyer's talk. Right. You know, when you're talking about something... As opposed to evidence. Well, and the evidence is on the record. I mean, what the lawyers make of the evidence, you know, that's their job, is to try to explain that evidence to the jury. And in these cases, you know, these courts, as this court said, Crawford has to carefully scrutinize what constitutes... Could I ask you a procedural question, Mr. Warren? Yes. About whether you raised the cherry-picking as a matter of law in your Rule 50A motions. You cited in your yellow brief, I think, pages 1 and 2 of those two documents. I did not see that theory there. I don't. I believe we did, Your Honor. What you argued there was a lack of comparability for the 13 transactions in question. Right. You've clearly preserved that argument. But for purposes of judgment as a matter of law, it seems to me quite a different argument that not that the 13 were not comparable, but that the 13 were not representative of the larger data set. Well, I would submit it was a bulk of the argument, and the closing argument in this case, and when there was... I'm talking about Rule 50A. This is basic trial procedure to preserve this sort of argument for this sort of appeal. That's right. And I didn't see it. Well, Your Honor, as you know, we filed a renewed motion for a judgment as a matter of law in this case, and the district court, when ruling on those issues, indicated... Are you talking about after judgment or before judgment? Well, it was after the initial judgment. There was an amended judgment in the case. And when we filed a renewed motion, the district court, in dealing with this issue, indicated that it had already decided the substantive issues that were contained within it. Well, look, a trial judge will have a lot of reasons to decide on both merits and procedural grounds or to skip one or the other. But we've got a question about whether we have the power to address that cherry-picking argument. And I haven't seen a response other than we said it in pages 1 and 2 of our 50A motions, where it has to be, and it's not there. Well, again, I would submit, Your Honor, that it was raised. But to the extent, Your Honor, it doesn't believe it was raised in that brief, it was raised in our subsequent 50A motion, and the court ruled on it. It did not dismiss it out of hand. It ruled on that motion and indicated... Which docket number are you referring to? May I, Your Honor? Please. The ones you cited were 484 and 486. Your Honor, I'm having my pardon. If you want to address it on rebuttal, that's fine. Let's move on to something else. There's a lot to talk about this morning. Indeed. Indeed. And I understand your concern, so we'll get back to you. On the cherry-picking argument, was there any... Can you tell me what back-pocket money is? There is a... As I understand it, there is a certain amount of discretionary money that the dealer can be offered in order to close the deal. Was Moore ever offered any of that? I don't know, Your Honor. I don't know what the record reflects. Well, the closing argument suggests no. Moore never heard of it until the litigation. Disagree with that? I don't know, Your Honor. I can't speak to that. I will say that... Were you trial counsel? I was not, Your Honor. But I will say that what the evidence did show is that if you looked at the... I mean, if you looked at this data as a whole, let's assume for the sake of argument that these are even remotely comparable situations, that on balance Andy Moore performed as well or much better than other dealers. So if one were going to look at a representative sample here and do some sort of statistical analysis... Did you do that? It wasn't our obligation, Your Honor. No, but... No, we didn't. We explained to the jury the reasons why these were not comparable situations. And indeed, I think what we did point out to the jury... Take, for example, one situation in which Andy Moore said that they didn't get the RSA concession they wanted. In their own set of data, they had requested and received not only a higher concession on a different transaction but the very highest concession within that six- or seven-month window of time. Let me raise with both you and the other side one of my concerns about this cherry-picking argument, if we can reach the merits. Your theory, if I can put it a little simplistically, seems to assume that Moore has to show it was treated worse than anybody else, than any other franchisees, to make such a claim. And Moore's argument seems to assume that as long as we weren't the best treated, we've got a claim. I can't imagine that either of those positions is actually correct, but I'd appreciate some guidance for how one goes about identifying, under the Indiana statute, unfair discrimination among franchisees. Well, let's consider two scenarios in which I think a price discrimination case could actually be made. Your Honor addressed that issue before, and I think it's important. One would be a situation where a customer comes into Andy Moore's dealership and asks for a quote on a particular transaction, a certain number of trucks with particular options, very specific, I need these $30,000 worth of custom options on the trucks, and they're going to be built that way. And then he walks into another dealership in Indiana, which there have been five or ten, and asks for... Are there five or ten? It's not in the record, Your Honor. Really? Volvo can't tell us how many dealerships it has in Indiana? Your Honor, as I sit here, Your Honor, I don't want to speak outside the record. I can Google that this afternoon, and I don't think it's a dispositive fact. I'm just astonished that... Your Honor, I was looking at it this morning, and I believe if you're talking about actual dealerships themselves, physical structures, there are more than ten, or approximately ten. Some of them, I believe, are owned by the same franchisees, so I don't want to overstate what it is. But you go into another dealership, and Volvo offers... It's exactly the same deal. They offer the other dealer a better concession so that they can offer a lower price to the customer. In that situation, the other dealership... It would be an iterative situation where dealer one offers something, and then the customer goes, and dealer two offers something a little better, and so on. I want to ask you a legal question. I'm looking at the relevant provision of the Indiana Code, which, you know, this is this 23.2.7.2 subpart 5. It's unlawful to engage in any of the following acts in relation to the Agreement 5, discriminating unfairly among its franchisees. That's the part we're worried about. And I want to know what case law, if any, from Indiana tells us whether we're supposed to understand discriminating unfairly as what I'll just call an overall or systemic practice versus a deal-by-deal-by-deal practice. I don't think that the law of Indiana is particularly insightful on that, Your Honor. Well, it's a very important question for this case because you are fundamentally presenting two different readings of the statute. Your reading of the statute is as long as overall, you know, over some period of time, I don't know, over a year, over something, it all comes out in the wash, so to speak. You know, maybe this deal's a little better, this deal's a little worse, but those kinds of variations are to be expected. That's your theory. Their theory is if there's even one transaction where they didn't get as good a price concession, they didn't get, you know, whatever warranty, whatever got thrown into that RSA package, then they have shown a violation of the law. Now, it seems to me that's in part a legal question. What does it mean to say discriminating unfairly among franchisees? And this is obviously an issue of Indiana law where we need to follow whatever tea leaves we can follow. Well, Your Honor, I would submit, Your Honor, that it is not only our position that they were treated overall better than everybody else, although that is what the data shows. The data also shows that the plaintiffs have failed to establish discrimination on a transaction. Well, but what if they have? I mean, the jury thought they did show on a certain number of transactions, and it seems to me if you are saying you're entitled to judgment as a matter of law, you have to be saying that the jury was answering a question that didn't really matter, that even if, you know, transaction number one was not as favorable to Moore, maybe transaction number 15, outside this group of 13, was more favorable to Moore, and it's your view as I understand it is that it's impossible to get it down to that kind of granular level. Well, again, like if we consider the hypothetical situation in which one dealer is favored over another with respect to precisely the same transaction. With respect, right, in one deal. In one deal. Buyer A wants to come by five trucks. Right, and if they are discriminated against, if they are treated unfairly vis-a-vis the other dealer in that one situation, I would concede that is discrimination. You would say that violates 2.725. Right, but remember, Volvo has a policy that expressly prohibits doing that because that would be discrimination, and as a matter of fact, their RSA policy expressly says it in their RSA guidelines that they have. You know, it says list out all the competitive circumstances, but remember, we're not going to give anyone a better deal than any other dealer if it's for the exact same deal. Yeah, but Mr. Warren, does that ever go to occur? Because isn't your position every deal is unique? Well, no. The options alone, whether just the size of the cab, air conditioning, you name it, tweaks the deal. So doesn't Volvo Reserve... Well, it has a policy in place, and I appreciate that, but how can we ever fathom whether that's carried out when every deal, every deal, I would suggest, probably is not matching up with a deal at a similar size dealer for a similar size quantity of trucks? See, I think the issue isn't so much the quantity of trucks because it's this $35,000 option package that varies so dramatically. Well, it could because a customer can shop dealers. That's the situation that would happen. If I know... I'm a business, and I want... I have very specific specifications about what I need for these custom trucks. I go to Freightliner, I go to Peterbilt, and I may also go to two Volvo dealers, and if I do, those Volvo dealers have to be treated the same for that particular deal. Well, let me ask you this. If you've got a relatively new dealer and Volvo wants to help that dealer, would Volvo give a better concession to that dealer just to get that dealer up and running? No. That would be discrimination. That would be discrimination? In other words, if they gave another $50,000 for signage to one dealer so-called similarly situated to another, you would say that's discrimination by Volvo? In terms of sort of the business operations side of things? Well, it all goes into the mix, I guess. There are a lot of ways to discriminate among... Right. But I see... I guess I see two scenarios, and I know I'm going into my time, but I want to use it here because I think it's effective. We have two scenarios. We have the individual circumstance where there could truly be a comparable situation. As this court said in Crawford, if you're going to use one or two comparisons, they better be the same. They better be exactly the same, or else it's not comparable. The other one is if you're going to sort of throw caution to the wind and sort of try to match up things that aren't similarly situated, you have to have a representative sample. That's the flip side of it. So if you're going to have a representative sample, you can't cherry-pick from the data. You've got to look at the data as a whole. And here we have neither of those two things. So those are two of the fundamental problems here, but they're not the only fundamental problems here with the data. Obviously, as Your Honors know, they used out-of-state comparators here in their analysis, and we would respectfully disagree with the waiver argument because the waiver argument did not go to the interpretation of the statute. It only went to whether or not there was a constitutional challenge being brought. All we argued in our motion was that the statute had to be interpreted under K.S. and under Morley Murphy, which Your Honor knows well. You guys know all these cases very well. Because of the presumption against extraterritoriality, you have to interpret it as meaning discrimination among Indiana franchisees. Now, it is true that the plaintiff's in this case. There are three things that I still want to ask you about, including on this issue about the scope of the statute. Yes, Your Honor. It seems to me that your logic about interpreting the whether it's the Indiana statute or a constitutional avoidance theory or a constitutional theory, that your theory reaches not just price discrimination but any form of discrimination among franchisees. Would you agree with that? Because, as Judge Flom was just suggesting, there are a lot of ways to treat franchisees differently. You can do it with advertising. You can do it with credit. You can do it with sales quotas and how tightly they're enforced and operating standards and on and on and on. I would agree that the way that the statute is drafted, it does not use the word price in it, so it would not be so delimited. And your constitutional theory would seem to reach that far, right? I think that's right, Your Honor. So let me throw a hypothetical from a different scenario. Let's suppose you've got a state that has outlawed employment discrimination on the basis of sexual orientation. The plaintiff wants to make a circumstantial case. He's a, let's say, a regional sales manager. There are only 20 other people in the country at the same level. And his comparators are all out of state. Would it violate the Commerce Clause of the United States Constitution to use them as comparators in his state law claim? Probably not, Your Honor. What's the difference? Well, I think the difference here is that in that case, we have to look at the practical effect of the statute, right? We're talking about a race or sex discrimination claim. It is not like an employer could say, you're using these as comparator is going to hinder me from discriminating against individuals in other scenarios. What we have here, on the other hand, is commerce. So when you have a commerce situation,  or highest price, concession. The argument would be the same. That is, look, if I have to treat all 20 of these regional sales managers exactly the same way to avoid discrimination under the law of State X, then State X is effectively controlling how I deal with my employees all over the country. Well, again, I see my time is up. No, you have to finish. We've got some more questions. I would think that that situation is different because there you're talking about prohibited conduct, statutorily prohibited conduct. So in other words, I don't think it would be a much weaker... So is this? Well, okay. I think it would be a much weaker... Well, I mean, just to suggest, with the employment discrimination situation, you're talking about whether the action taken in Indiana with that person is acceptable. You're not telling them to hire a fire or not in Montana. Secondly, in your situation, tax rates can vary among states. There are exogenous factors that may exist that the employment situation does not raise. I'd like to ask you about a couple of statutory issues that you haven't addressed yet. One is the limitation of remedies question. At page 20 of your yellow brief, you made the rather astonishing claim that parties are free to contract around the Deceptive Franchise Practices Act, citing the Continental Basketball Association case. Allen's Junior. Yes. I do not read that case that way. And, in fact, if Indiana courts thought you could contract around the Franchise Act, there wouldn't be any point in it, would there? And, in fact, what happened in the CBA case is that the court said the fact that there might be a problem under the statute does not mean the entire contract is void. But I haven't seen any Indiana courts say, we're just going to disregard, we're going to go ahead and enforce this provision in the contract that violates the statute because the parties agreed to it. Well, a few things. First of all, I do think the Allenstein case says that only when the legislature says that contracting around it would render the contract void. But the issue is when it's void, not whether the particular provisions are enforceable. That's right, Your Honor. That's a huge difference. If you're trying to say, well, we don't have to, that we can enforce a contractual waiver of remedies, if that's what happened in the contract. Well, again, let's look at the actual statute in this case. Because as it applies to this case, I think it is apparent that the statute doesn't apply given the factual circumstances here. So here are the facts. That's not my question. My question was about this notion. You've argued a lot of these things in your briefs, and we have those. But I'm just astonished by the suggestion that parties can contract around it. The second question I wanted to raise with you is about the issue you haven't talked about at all, which is good cause for termination. And I'm looking at page 23 of your yellow brief, where you're arguing that Moore agreed that Volvo could terminate its dealer agreement if it did not build the new facility. And you say, indeed, the statute, Moore cites, does not, quote, does not prohibit the enforcement of a voluntary agreement between the parties. Do you remember that? Subsection B of Section 23. I'm following you. Okay. Do you remember the rest of Subsection B? A voluntary agreement between the manufacturer, distributor, and the franchisee where separate and valuable consideration has been offered and accepted. I don't see that language in your brief. Why is it missing? And what effort did you make to show the district judge or us that you satisfy it? Your Honor, may I take a look at the language? Please. Sorry. Your Honor, I am looking at the language that you showed me. Your Honor, if you think that we should have cited the rest of the section, I don't know. You're claiming you satisfied it. Right. You blew off the critical criterion, because if all you need is a voluntary agreement, then Subsection A might as well not exist, right? The legislature insisted on the separate and valuable consideration. Well, again, let's look at the agreement. Why could it not be separate? Did you argue that to the district court? We did. Did you argue it to us? That you've got a separate agreement that requires Mr. Moore to build a new facility? You're building this whole thing on the application, right? That's right. To the extent the application is subsumed within the agreement. I know that's your theory, so tell me where is the separate and valuable consideration for the promise to build a new facility? Well, why is that separate consideration not subsumed within the agreement itself? Thank you. I think we're done. Okay. I'll give you a little bit of time for rebuttal, but I think we can stop here. And we will hear from Mr. McGill. And, Mr. McGill, if you need any more time, you will obviously get it. Well, thank you. Good morning. May it please the Court, I'm Rob McGill, and I represent Andy Moore Truck Center in this matter, and with me today is Jessica Lindeman and Alex Orlowski, who also participated in the trial of this case. So I have an opening question for you, which is whether the logic of your position is actually that this Indiana statute prohibiting discriminating unfairly among the franchisees is actually a nationwide most favored nation MFN obligation, such that if Volvo anywhere in the country doesn't give a deal that's as good as the best deal, it's violated the law. It is not, in our view, Your Honor. So why not? I mean, since obviously there are these, whatever you want to say, 13 or 9 transactions, where I'll assume as the jury found Volvo gave a better deal to somebody else in this RFA. So what if there had been one transaction? Would that have been enough to justify damages for the jury? It would depend on the facts that we proved at the trial. No, I'm saying, but you proved 9, suppose you only proved 1. Yeah, if we proved 1, we would have to prove unfair discrimination under similar marketing and financial conditions. So even one transaction where Andy Moore doesn't get a deal as good as some other Volvo dealer, perhaps, I don't know who else, let's assume just some other Volvo dealer, violates the statute. It could. Any action that doesn't match or better. Of course, as soon as you give Andy Moore a better price than another dealer, I assume that other dealer would be suing you under this same theory. We would credit the legislature for being somewhat thoughtful here, and I don't mean that in the wrong way, but I will say this. When they made the legal requirement for our proof in this lawsuit, Your Honor, to be making the proof that there was unfair discrimination in whatever form it comes, and that we had to show in our prima facie case that these were similarly situated franchisees. We're beyond prima facie cases. We're at a trial, and a jury is sitting there. And so you showed, again, I'm giving the benefit to the jury. You showed that there were a number of transactions, whatever number the jury accepted, where Andy Moore didn't get as good a deal under these RSAs as somebody else, some valid comparator. Fine. So if Andy Moore had gotten the best deal in transaction number 14 or transaction number 20, why doesn't that allow the disfavored franchisee in that case to sue Volvo? See, I'm saying it just seems to me it forces Volvo to absolute parity by perhaps objectively ascertainable facts such as model number, features, you know, as Judge Flom was saying, you know, whether there's air conditioning. You know, you could list what the product is. And I don't see anything in this Indiana Code that packs that much punch into the word unfairly. I think there's a limiting principle in the statute, and I think there's an industry practice that was informed by our expert that answered your question. First of all, with respect to a claim on one transaction, Your Honors, you're pointing to or you're referencing, in that case we would have to show that we were unfairly discriminated against compared to somebody else in one transaction under similar conditions, and that gives Volvo. And you said you showed all of those things for the 13 transactions. We did show that, and we did it through an expert that said the following, that the industry practice, and this is Mr. Faulkner testifying on more than 30 years of experience in the heavy truck industry, said that the starting point is the model number and the percentage discount given on the model number. I get all of that. I mean, I waded through what was an extraordinary number of pages to read to get ready for this argument. And what concerns me is that today it's Andy Moore getting $6.5 million for nine transactions. Tomorrow it will be XYZ getting another $6.5 million because Andy Moore got a better deal on some other transactions that are comparable in precisely the way Mr. Faulkner described, precisely the way that you've rested your theory. And it's a lot of, I mean, it seems to me that would be actually a terrible system, number one, but discriminating unfairly among its franchisees could mean a lot of things. I mean, you have it on a case-by-case, truck-by-truck basis, and I'm not sure that's right. I welcome any pointing to Indiana law that there might be that would help me here. Let me first answer the legal feature of this in relation to your question. With respect to Volvo Trucks North America as it sits, when it has a, let's say it's a 500-truck deal to sell it on, as we had in our lawsuit, and that we wanted to make a presentation about 500 trucks and somebody else in California wanted to make a presentation about 500 trucks, and they asked for a concession, price concession by model number. Under the Indiana legal principle, if Volvo had evidence in that circumstance where they said, look, we've never sold to the customer that's now wanting 500 trucks in California. It is good for our business, and under those marketing conditions and under those financial conditions, we can make the choice. And so that is the legal limiting principle. That's how we try. Why, I don't, that seems so fuzzy to me. You know, Volvo, so you're conceding that Volvo can say, you know, we have this business reason to give the extra boost, in your example, to the California dealer. I mean, maybe in another situation, as I was speculating, you know, maybe California has a tax structure that would make the customer less likely to buy from a California dealer unless there was a little additional sweetener from either the dealer or from Volvo or from both, most likely. I just don't know. Discriminating unfairly, it's not just, you're reading this as though the word unfairly isn't in the statute. You're essentially saying if there's any difference at all, unfair, fair, or otherwise among franchisees, the Indiana statute's been violated. We would say, we would add quite a bit to that in this sense. Our lawsuit was about this context. What happened was there was a promise to Mr. Moore to give a Mack truck dealership if he took Volvo. I know that background, and you've actually raised that as a separate theory. You have the integration clause to deal with just as Volvo has, you know, its problems and more as Judge Hamilton was exploring with the alleged promise to build a new facility. But my understanding is that we are trying to see in this count of the complaint whether Volvo discriminated unfairly by having 13 transactions in which it didn't give Andy Moore the best deal under the RSAs. But in this case, we have the CEO of North America instructing his legal team and his business team to take Andy Moore out using whatever, quote, tactics they needed to use. And this is in the record. No, I remember that quote. Was that evidence in front of the jury? It was. And the citation for that, Your Honor, is the Slegel deposition at ECF 231-1, pages 30 and pages 46. I thought there was a fight about whether that particular segment came in, and I saw one part where it stayed out. Did it come in someplace else? I believe that each of these citations, I believe that page 30, lines 5 through 13, 30 lines 14 through 22, and 46, 17 through 24, all were in evidence. And with respect to the question, what we have here, and when we looked at the law here, unfair discrimination, the discrimination occurred in a particular context, not just by virtue of what was told by the instructions of the CEO, but they went after fleet transactions. And with respect to the fleet transactions, that's what we focused our lawsuit on. The lifeblood of Andy Moore Truck Center, it was going to be made or not based on whether or not it sold fleet transactions. And if you look at the numbers, Mr. Moore and his business plan, for example, projected maybe he would sell 1,400 trucks in the year 2010 through 2012. Our trial evidence focused on, I'm sorry, there were 1,400 trucks on which we were not given appropriate trial, or I should say, price concessions. But here's what's worrying me about this still. I mean, people say, actually you can find this in antitrust cases, you can find it all sorts of places, people say all sorts of smoking gun nasty things. But if after a statement like that, all you can come up with is 13 transactions? I mean, he wasn't really trying very hard, was he? There were termination provisions in this franchise agreement. Well, he was trying very hard, in our view, according to the evidence that we brought to the jury, because with respect to those transactions, that was 1,400 trucks, $140 million of trucks. And the aftercare associated with $140 million of trucks. To us, it was an instruction to end it for us. Mr. Moore, through his own diligence and efforts, may do. But he brought his case and he focused on what happened in the fleet transactions. They knew, and we had trial evidence to show, they knew what they were doing here. And with respect to when it counted, what we said there and what we're saying here this morning, when it counted, we were taken out of the mix. But, you know, you've conceded that you couldn't make a Robinson-Pattman-type price discrimination claim, or certainly that you didn't make that. But yet the only thing you're really complaining about is price discrimination that's somehow unfair without proving any competitive effects in the market, without proving the normal things that you would prove in a Robinson-Pattman case. Well, and what we would say is we would not use the word price discrimination to describe what we have been talking about in our lawsuit. But that is what you're talking about, because the RSA is a discount on price. So there's obviously a starting price that's really just sort of a hypothetical number, and then the real action is in what this RSA is going to be. It's a price discount. It was the principal component of the unfair discrimination evidence that we presented. So what's price discrimination? He's not able to offer a price that's as attractive as the price that his competitor Volvo dealers are offering. But our evidence had more to it than that, because they could have made up for their failure to give us price concessions with warranty concessions, with parts concessions. But you can monetize all of those. That's all, finally, the price. Well, understood. But what we're saying, and when we look at unfair discrimination in the statutory context that we dealt with, what we were looking at is all of the, whether it's back pocket money, warranty accommodations, those kinds of used truck price supports at trade-in time, those were all things that we looked at. And as we look at the state statutory protection, why do we make that choice? Because we decided, appropriately or not, that we would attempt to carry our burden of proof on unfair discrimination in all its forms. And as the evidence came in and the judge accepted some of our evidence, not others. And so we would have to accept that under Indiana law, even a bad deal for as little as one transaction would be enough to show the violation, and that would simply be reflected in the jury's damages award or in some other fashion. Because it could be a big deal. It could be one transaction for 500 trucks, as you were saying. That would be a fleet transaction of major proportions. So it sounds like it really is a very strong command for identity of terms. We didn't look at it that way at all at the time we tried our lawsuit. But that's what you're doing, right? Because how could Volvo avoid liability in this case? The only way it could avoid liability would be to have absolutely identical terms among all of its dealers. When it deviates from that, the dealer with the worst terms has a cause of action, and, you know, today Andy Moore, tomorrow somebody else. And if I may add a gloss to that, particularly if you're talking about being able to compare transactions across several months across the whole country. Yes, and the district court limited us, Your Honor, to the one month before and one month after compared or time frame, and said that that would be the evidence that would be accepted. And then in Exhibits 2A through 2M, that was what the court and the parties agreed to that evidence being put in. Volvo agreed to the same format when it presented its comparator evidence as things moved forward. But in terms of making the proof that we, going back, if I might, just to your hypothetical here for a moment, when we looked at the burden of proof that we understood we had and that Volvo had for its part, it's not enough in one transaction for us to say just literally this is just price X versus price Y and that's the end of it. We believe that the statute says that we have to show in our prima facie case, and we certainly endeavored to prove it, that these were substantially similarly situated franchisees under similar financial market conditions. One final comment. How did you prove that? We brought the expert, Mr. Faulkner, in to testify after reviewing all 20,000 records, all of them. Can you give an opinion to the jury as to whether these are substantially similar? Yes. What is your benchmark? My benchmark for this purpose and these 13 transactions, my benchmark, is to look where everybody starts in this industry, model number. That's why I'm having trouble with this because you said substantially similar, substantially different market conditions. Substantially similar could mean that you're both in an urban area or that you're both out in the middle of rural Montana, or substantially similar could mean you were in the first five years of doing business and so you're still maybe kind of in the startup, building up goodwill phase of things. Substantially similar could mean that you are of a certain size and able to handle an inventory of a certain size, how many square feet or yards or whatever is your facility. You're saying, and I certainly agree that a starting point would be that both dealers are selling the same model number and perhaps the same add-ons, but I don't know what that means. We took on maybe more than we should have, but we also brought evidence from the Volvo side, and we asked them, what is substantially similar? Answer the question, please. Mr. Hybers, a senior vice president of their company, said, and this is at the record, our appendix at page 169, that he said for purposes of determining whether they were similar transactions, he would look to the model number to make that determination himself. Right. No, I think there's a fair amount of evidence that model number is significant, but there's also a fair amount of evidence that with these large class A trucks, there's a lot of additional, I'll just call them options, that can go on the truck or not on the truck that are really going to influence the price to begin with before we even start talking about the RSAs. Well, and we felt for purposes of the Indiana statutory requirements and our burden of persuasion, we felt that we also needed to show that there were no competitive circumstances on the Volvo side of the ledger which warranted a price differential on model numbers or discount, and we presented evidence from Mr. Kress, who was their senior vice president, on that topic, and what he told us is as to competitive circumstances, his testimony, you never really know. He says you never even know sometimes until the deal is over what the competitive circumstances were. Yeah, Mr. Mayor, let me ask you. As you can see, we're trying to frame up some analysis that can either support or not your theory. Let's say we do have two similarly situated dealers, and I'll accept that the models are similarly situated, that the deals are similarly situated, but Volvo, in its production, supplies one dealer 30 days ahead of another dealer. In other words, the inventory flows for two representative-type deals, so I'm trying to keep those variables the same. Would they be violating the statute by opting to send what inventory they had on hand, all models being the same, 30 days sooner to one dealer than to another? Would that violate it because it's all going to, and I'm assuming concessions are similar, it's just going to be lost concessions during a period of time? I believe the Indiana statute gives protection to either us or Volvo depending on the facts in your hypothetical, but in that circumstance, we would have to show, we would have to prove in that circumstance that these were similar marketing conditions or financial conditions. Volvo could say, in your hypothetical, you can't make that proof because we had inventory, the trucks were built, we had a right to price differently, so forth and so on. But it's the 30 days that Judge Flan was talking about. They've just decided that things have come in FOB, you know, wherever. They've come in to New Orleans. You want to put them on a boat and ship them up to Indiana. I don't know how they come in, but maybe that's how. But you just deliver them to one dealership sooner. Okay, and I didn't apprehend all of that as I should have. I think that's what you said. I'm trying to keep all the variables the same. It's just in the nature of the industry, and it's true, I suppose, with cars as well as trucks, that there's an X amount of inventory at the manufacturer's point of shipment, and that Volvo decides, for whatever reasons, that dealer A will get those 50 trucks 30 days ahead of dealer B. I'm trying to keep everything the same. Whether or not just the inventory flow, which could cause a loss of delivery of sales, even if you get the trucks, even if the boat deals are completed, you're without that revenue for 30 days because no one's paying you before they get their truck, I'm assuming. Right. Yeah, and in the inventory context, I don't think, I don't see a lawsuit there, and I don't see that there would be a claim that could be made of the type that we've made. The fleet context was our context, which is through a formal process sponsored by Volvo, you submit your request for a price concession, they answer or give you a concession or not, and the trucks are built in the future and delivered to the fleet. And so that is a distinction that we have here. If I may, just to address two quick points on our cross-appeal. With respect to the cross-appeal that you have seen from us, the judgment on the pleadings that was entered against our Indiana Franchise Disclosure Act claim we've shared with you on brief our point of view on that. And with respect to that Franchise Disclosure Act, contracts, as we've heard this morning, and as we can read in the law, contracts do not supplant statutes. And with respect to the Franchise Disclosure Act argument that we've made on brief, you've seen what we've had to say there, but in terms of our cross-appeal, what we would say is that Volvo may not eviscerate that statutory protection through an integration clause. If it could, by contract there would be no statutes. That seems to be an over-reading. I'm troubled by this problem on your cross-appeal, and that is Mr. Moore is about as sophisticated a commercial party as we're ever going to see in litigation, as is Volvo. He certainly knows how to get a binding enforceable promise to get a Mack truck franchise. And I understand your argument that Indiana case law has loosened up quite a bit with respect to fraudulent inducement. My concern is that if we accept your argument on the cross-appeal, it would seem to be pretty near impossible for sophisticated parties to just nail down in writing a deal that's conclusive. What would it take under your theory for two sophisticated parties to say the writing is the deal, that's it, nobody's talking about any other oral promises, nothing related, it's all in the papers? So no question, very sophisticated parties, no question about that on both sides. But there's a specific industry practice. We never got to the point of evidence because judgment on the pleadings was entered against our client. But why do we get to industry practice? I mean, to answer Judge Hamilton's question, you have to address the problem of there's a lot of conversation that goes on before a major commercial deal like this, and maybe some things are thought about to throw into the hopper and people decide let's just do this later and maybe other things are done. But people want to say this is our deal right now, and you don't think this was your deal right now. You think the Mack truck dealership was also part of the consideration for opening the Volvo dealership. That's the difference here. Well, and there's a very, very big difference here between these sophisticated parties. Dealership deals are made all the time, and Mr. Moore would have so testified had he been allowed. Multiple dealerships that he's gained have been on the agreement made orally and a handshake. Well, that may be, but I don't know that that changes the law of Indiana about an integration clause saying we are not carrying forward that oral agreement. You've made the integration clause meaningless, I think, on that theory. This is an integration clause except for all the oral agreements that we may or may not have made before, is your reading of it. Well, but what the Indiana legislature has worked to do is to make sure that franchisees are not misled in connection with the transaction. Well, this is the mythology that franchisees are always powerless and franchisors are always huge and looming, which sometimes may be true, but sometimes they may be both parties who are rather sophisticated, as here. Our point here is that a jury should have heard from Mr. Moore on this and Volvo both on the question of whether or not did you make this promise, yes or no? Why is it relevant if the integration clause shuts off the previous promises? Again, your integration clause says this is the full agreement between the parties except any other oral agreement that we may have made before. Yeah. In our case, what happens here, and this is the limiting principle that I think the court's asking about is, does this mean that you'll never have a final agreement and you'll never have an integration clause? No, because this is a specific statutory framework dealing with particular types of people who have a history of dealing with each other. So there are no integration clauses in franchise agreements? Well, I would say that the integration – I'm not ready to say no integration clause. What I'm willing to say to the court – You need to say that, though. I thought the needle you had to thread was that there are integration clauses and then there are integration clauses. That's right. And that you somehow can get to fraudulent inducement under some of the recent Indiana cases that way without a no-reliance clause. Without a no-reliance clause. And I guess what's your best case law on that? The best case law is what we cited on brief, and the most recent decision I think that we have is what we explained, and I've got the citation here. The Wind Wire case, Indiana Court of Appeals 2012 and Hardee's of Mauville, which the court's familiar with. So those are our points. We thank you for the time this morning. If the court has no further questions, we would ask that the judgment below be affirmed, the declaratory judgment, denials, or the summary judgment grant be affirmed as well. All right. Thank you very much, Mr. McGill. I will give you two more minutes, Mr. Warren, because we asked you a lot of questions. Thank you, Your Honors. Judge Hamilton, I want to go back to what you asked me about the separate and valuable consideration. We should have included that in our brief. It was improper for us not to cite that section, and I apologize. I would note that the prohibition in the unfair practice section is only if requiring it would be economically unreasonable. And since Mr. Moore had agreed to build the facility, I would submit that it would not be an unfair business practice. You all terminated him because he wasn't building it when you were already in disputes over the dispute resolution over the Mack truck deal, right? The window of time that he promised to build it was 11 to 13 months. The lawsuit was not filed until, I would say, almost two years ago. I was asking about ADR. I don't know as I stand here, Your Honor. Thank you. Your Honor, just a couple of quick thoughts. I think about what is the theory of discrimination here, as Your Honor has been talking about it. It seems that Andy Moore has sort of articulated two different theories. One is if you don't give us as much or as high a concession as anybody else on these deals that are ostensibly similarly situated, we've been discriminated against. As Your Honor pointed out, that means that every single dealer can sue for discrimination. So I would submit that can't be a theory of liability under the Indiana statute. So the alternative is, and I think it is expressed in the briefs, is that they are essentially complaining that they did not get the concession request that they asked for. And that presents a completely different dynamic because, first of all, their comparators, if one looks at their comparators in their 13 charts, these comparators aren't getting what they asked for either. So if this really comes down to a question of did we get what we asked for, number one, their comparators don't make a prima facie showing that they were mistreated vis-à-vis other individuals. And number two, how could you predicate a discrimination claim based on your own request, because those requests themselves might be depending on the circumstances? I don't think the amount of the request makes a difference, does it? I thought they were comparing actual percentages offered by Volvo. That's the theory, isn't it? Well, I think if Your Honor looks at their brief, they sort of state it both ways. One theory is you didn't give us the highest RSA. That's what their charts show. But the other way that they say it is that the way that Volvo discriminated against them was because Volvo didn't give them what was necessary. That sounds to me like a straw man. I mean, that theory doesn't have any legs at all. I agree, Your Honor. So on the one hand, and I think I have the page where they say that in our brief where we're identified, but that is essentially the crux of what they're saying. We needed X amount of money to close this deal, and Volvo didn't give it to us. Meanwhile, they were giving concessions to others. So if that is their theory of the case, there are no legs to the theory. Now, the first part of that is not enough. You didn't give us what we wanted is not enough. If you didn't give us what we needed and you were doing better for others, that's what we've been talking about all morning, not the abbreviated version. Well, what you are doing better for others. Again, if that analysis is just is that number higher than what we got, then every single dealer can file a discrimination case in every single case. The only alternative is if what Volvo is saying is you didn't give us enough money to close this particular deal on which we requested an amount different than we requested a month ago in a different deal. If you're not giving us what we need in every case, if that's their theory, the evidence doesn't support that. Okay, I think you need to wrap up here, Mr. Warren. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.